# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## FORT WAYNE DIVISION

| | |
|---|---|
| WENDY L. RICE, | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| v. | )      **CAUSE NO. 1:16-cv-00340-SLC** |
| | ) |
| COMMISSIONER OF SOCIAL | ) |
| SECURITY, *sued as Nancy A.* | ) |
| *Berryhill, Acting Commissioner of* | ) |
| *Social Security,*[1] | ) |
| | ) |
| **Defendant.** | ) |

## OPINION AND ORDER

Plaintiff Wendy L. Rice appeals to the district court from a final decision of the

Commissioner of Social Security ("Commissioner") denying her application under the Social

Security Act (the "Act") for Supplemental Security Income ("SSI").[2] (DE 1). For the following

reasons, the Commissioner's decision will be REVERSED, and the case will be REMANDED to

the Commissioner in accordance with this Opinion and Order.

## I. PROCEDURAL HISTORY

Rice applied for SSI in January 2013, alleging disability as of November 20, 2007. (DE

11 Administrative Record ("AR") 252). The Commissioner denied Rice's application initially

and upon reconsideration. (AR 199-206). A hearing was held on December 3, 2014, before

Administrative Law Judge William Pierson (the "ALJ"), at which Rice, who was represented by

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security, *see Casey v. Berryhill*, 853 F.3d 322 (7th Cir. 2017), and thus, she is automatically substituted for Carolyn W. Colvin in this case, *see* Fed. R. Civ. P. 25(d).

[2] All parties have consented to the Magistrate Judge. (DE 14); *see* 28 U.S.C. § 636(c).

counsel; her mother; and a vocational expert, Marie Kieffer (the "VE"), testified. (AR 50-98).

On March 3, 2015, the ALJ rendered an unfavorable decision to Rice, concluding that she was

not disabled because despite the limitations caused by her impairments, she could perform a

significant number of unskilled, light exertional jobs in the economy. (AR 24-43). The Appeals

Council denied Rice's request for review (AR 1-11, 362-63), at which point the ALJ's decision

became the final decision of the Commissioner. *See* 20 C.F.R. § 416.1481.

Rice filed a complaint with this Court on September 22, 2016, seeking relief from the

Commissioner's final decision. (DE 1). Rice advances two arguments in this appeal: (1) that

the ALJ failed to account for her moderate deficits in concentration, persistence, or pace when

assigning the residual functional capacity ("RFC") and when posing hypotheticals to the VE at

step five; and (2) that the ALJ improperly determined at step three that Rice did not meet the

"paragraph C" criteria of the mental health listings.

## II. FACTUAL BACKGROUND[3]

At the time of the ALJ's decision, Rice was 44 years old (AR 252); had a 10th grade

education with some special education classes (DE 275-84, 291); and had past work experience

as a cook and a cleaner, though this work did not rise to the level of past relevant work (AR 41,

87, 344, 346). In her opening brief, Rice alleges disability due to: asthma, chronic obstructive

pulmonary disease ("COPD"), emphysema, diabetes mellitus with some neuropathy, obesity,

recurrent major depressive disorder with psychotic features, anxiety, borderline intellectual

functioning, learning disorder, and degenerative disc disease. (DE 19 at 2). Rice does not

dispute the ALJ's findings concerning her physical limitations (DE 19 at 2 n.2), and thus, the

---

[3] In the interest of brevity, this Opinion recounts only the portions of the 1102-page administrative record necessary to the decision.

Court will focus on the evidence pertaining to Rice's mental impairments.

## A. Rice's Testimony at the Hearing

At the hearing, Rice testified as follows:  Rice is single and had been living with her mother and grandmother for three years.  (AR 55, 57, 74, 77).  She did not have health insurance at the time.  (AR 55).  She did obtain Medicaid several years earlier with Park Center's assistance, but it was discontinued after her caseworker reported that she "was a whole lot better."  (AR 55).  Rice has a driver's license; she drives to the store to pick up items if her mother forgets something, but she does not do the grocery shopping.  (AR 57-58).  She helps her mother by performing household tasks such as vacuuming and washing dishes, but sometimes she gets distracted and her mother has to tell her to finish the tasks.  (AR 58, 64-65).  Her mother has to remind her about appointments.  (AR 60).  Rice goes to church twice a week and loves spending time with the people there; sometimes she and another person go door-to-door in the community for their church's ministry.  (AR 62-63, 78-79).  Rice described her typical day as watching television most of the day and napping three to four hours due to boredom.  (AR 63, 72, 85-86).  She tries to read the Bible every day as well, but sometimes she does not understand it all; she can read and understand Genesis, but has more difficulty understanding Revelations. (AR 64).

When asked whether she had returned to part-time work, she stated that she had not, citing her record of theft charges.  (AR 59-60).  Rice explained that she had applied at K-Mart and it was going to hire her that same day, until it learned about her theft charges.  (AR 59-60). She had quit most every job that she had in the past either because she lost transportation or because things did not work out right with her co-workers, as she tells people off if they get on

her nerves. (AR 66). All of her past jobs have been part-time. (AR 67).

Rice stated that she still hears voices but they are not as loud as they used to be because of taking her medications. (AR 56-57). She noted no side effects from her medications. (AR 60). She sees her nurse practitioner and caseworker at Park Center once a month. (AR 55-56). She used "spice," an illegal drug, every day for seven or eight months in 2012 when she lived with a roommate, but she was no longer using illegal drugs. (AR 60-61).

### B. Rice's Mother's Testimony

Rice's mother, Dottie Rice ("Dottie"), testified as follows at the hearing: Sometimes Dottie drives Rice to her appointments, but other times Rice drives herself. (AR 75). Once in a while Dottie has to "referee" spats between Rice and her grandmother, as Rice "would almost have a threatening manner at home." (AR 75-77). Dottie felt like she had to walk on "eggshells" when Rice first moved in, but that has improved since Rice has been taking medications and "doesn't freak out as often." (AR 76). For example, when Dottie would point out something Rice did not do quite right, Rice would throw the cleaning bottle and rags and go sit by herself a while. (AR 76). After Dottie would give her some space, Rice would eventually come back and ask Dottie what she wanted her to do, and Dottie would then instruct her again. (AR 76, 78).

Rice started getting better after beginning treatment at Park Center and obtaining the right dosage of medications. (AR 77-78). Rice behaves better with people she does not know, such as the people she visits in the community, except that she does have a small "road rage issue." (AR 79, 81). Rice gets lost when she drives and does not have an accurate perception of length of time. (AR 74, 78, 80-81). Dottie does not let Rice cook unsupervised because Rice

does not clean up thoroughly, has left a burner on, and because Dottie finds it easier to do the cooking herself. (AR 82). Dottie has to remind Rice to perform her self care and to go to appointments. (AR 82-83).

## C. Summary of the Relevant Medical Evidence

In January 2010, Rice underwent a mental status examination by Aisha Devera, Psy.D., at the request of the state agency. (AR 364). Rice reported a 15-year history of auditory hallucinations, forgetfulness, and difficulty concentrating, which coincided with the time she began using Cocaine and Cannabis. (AR 364). Rice had a history of learning problems, but she reported adequate adaptive functioning. (AR 364-65). She was not receiving any treatment for her mental impairments due to lack of funds and no health insurance. (AR 365). Rice had been had been living with her girlfriend for 26 years. (AR 365). Her longest job had been at a fast food restaurant for one year, and she was terminated in 2006 for not going to work after she moved and could not find her uniform; Rice reported adequate relationships with her coworkers and supervisors. (AR 365). She admitted that in the past she had lost jobs due to drug use. (AR 365). She had been arrested for shoplifting in 2008. (AR 366).

A mental status examination revealed no memory impairment, a flat affect, and no suicidal or homicidal tendencies. (AR 366). Dr. Devera diagnosed Rice with a mood disorder, not otherwise specified; a psychotic disorder, not otherwise specified; and cannabis abuse. (AR 367). Dr. Devera discontinued an earlier diagnosis of borderline intellectual functioning, finding that Rice did not present as intellectually impaired, had obtained a previous IQ of 85, and reported adequate adaptive functioning; Dr. Devera indicated that untreated mental illness may have impacted Rice's scores in the past. (AR 367). Rice was assigned a Global Assessment of

Functioning ("GAF") score of 52.[4]  (AR 367).

Rice received mental health treatment at Park Center from January 2012 through December 2014.  (AR 509, 514, 516, 518, 570, 572, 628, 634, 707, 709, 711, 756, 774, 799, 810, 824, 828, 834, 1065, 1075, 1084).  She was prescribed medications, saw a case manager, and participated in counseling and classes.  (AR 610).  She was seen in person or received consultation over the phone approximately 23 times during that time period.  (AR 509, 514, 516, 518, 570, 572, 628, 634, 707, 709, 711, 756, 774, 799, 810, 824, 828, 834, 1065, 1075, 1084). Every three months, the Park Center treatment team reviewed her case status and progress.  (AR 574, 580, 886, 743, 749, 782, 801, 836, 1077).

During her treatment period at Park Center, Rice saw Karen Lothamer, a psychiatric nurse practitioner, approximately 13 times for medication management.  (AR 523, 535, 541, 547, 553, 564, 656, 744, 756, 791, 816, 1067, 1086).  In January 2012, Ms. Lothamer wrote that Rice had a cooperative attitude, appropriate behavior, coherent thought form, congruent and flat affect, depressed mood, normal thought content, no suicidal or homicidal ideation, normal

---

[4] GAF scores reflect a clinician's judgment about the individual's overall level of functioning.  American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders* 32 (4th ed., Text Rev. 2000).  A GAF score of 21-30 reflects behavior that is considerably influenced by delusions or hallucinations, a serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation), or an inability to function in almost all areas (e.g., stays in bed all day; has no job, home, or friends).  *Id.*  A GAF score of 31 to 40 reflects some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or a major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., avoids friends, neglects family, and is unable to work).  A GAF score of 41 to 50 reflects serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).  *Id.*  A GAF score of 51 to 60 reflects moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).  *Id.*
"The American Psychiatric Association no longer uses the GAF as a metric."  *Spencer v. Colvin*, No. 13-cv-1487, 2015 WL 684545, at *17 n.5 (C.D. Ill. Feb. 17, 2015) (citing Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 16 (5th ed. 2013)).  However, several clinicians of record used GAF scores in assessing Rice, so they are relevant to the ALJ's decision.  *See id.* (citing *Bates v. Colvin*, 736 F.3d 1093, 1099 (7th Cir. 2013)).

perception, and good judgment. (AR 524). The following month, Rice had some anger issues and reported hearing whispering voices telling her to do things. (AR 535). Her mental status was similar to her last visit other than she had a euthymic mood, hallucinations, and fair judgment. (AR 536-37).

In February 2012, the Park Center treatment team assigned Rice a GAF score of 42 and diagnoses of a major depressive disorder, recurrent, severe with psychotic features; and other substance abuse. (AR 574). Her strengths were normal thought content and memory, and her limitations were agitation, immaturity, poor judgment, minimal insight, denial of problems, anger, rigidity, concrete thoughts, and poverty of thought. (AR 575). She had a moderate degree of self-care impairment and had been misusing her medications or taking them inconsistently. (AR 575). After Rice moved in with her mother, Rice's compliance with medications and appointments increased, and her mood, sleep, self care, and insight then also improved. (AR 584, 590).

In March 2012, Rice reported to Ms. Lothamer that the last increase in Latuda had almost stopped the voices. (AR 541). Her mental status was similar to her January visit, except that she had normal perception, no hallucinations, and a depressed mood. (AR 542). Ms. Lothamer indicated that Rice was "[s]ymptomatic but stable." (AR 543).

In June 2012, Rice reported to Ms. Lothamer that a lower dose of Latuda worked better than a higher dose, as it caused less side effects and sedation. (AR 547). She denied hearing any voices, and her mental status was unchanged, except that her mood was euthymic rather than depressed. (AR 548-49). At a visit to Ms. Lothamer in August 2012, Rice's mental status was unchanged, except that she had good, rather than fair, judgment. (AR 553). In December 2012,

Rice reported to Ms. Lothamer that Latuda continued to work well, but that for the past few weeks, she had felt depressed, anxious, and restless. (AR 564). A mental status exam was about the same, other than she had a poverty of ideas, an anxious mood, and fair judgment. (AR 565-56).

In April 2013, the Park Center treatment team viewed Rice's progress as limited. (AR 747). She had been inconsistent with attending her appointments; her GAF score was 40. (AR 747). In July 2013, Rice still had problems with anger and decision making, but she was active in her church; she was enjoying working in the yard. (AR 787). She relied on her mother a lot to get things done. (AR 787). She had some intermittent depression, but felt that it was adequately controlled with her medications. (AR 787).

In January 2014, the Park Center treatment team assigned Rice a GAF score of 41; she was still very active in her church and was exercising on a regular basis. (AR 805-06). She appeared much more relaxed and focused in sessions. (AR 806). She denied any depression or anxiety and felt positive about her life, though she still reported issues with mood swings and feeling anger when pushed. (AR 806). In April 2014, Rice reported that her mother and grandmother help her out when she feels overwhelmed or stressed; she had cut ties to her friends who were not a good influence. (AR 840). She was making "steady progress," her insight was "greatly improved," and she felt "more empowered to go out and do things." (AR 840). She still had some anxiety and anger at times, but was using quiet time and walking to keep them under control. (AR 840). In November 2014, Rice's GAF score was 46. (AR 1077). She remained stable. (AR 1082). Rice wanted to look for a part-time job and was thinking about going back to Burger King; her treatment team was supportive of this to see how she would do with the

added stress.  (AR 1082).

On March 19, 2013, Rice saw Candace Martin, Psy.D., for a consultative psychological exam.  (AR 610-14).  Rice reported a long history of depression, hearing voices that tell her to do bad things, and difficulty being around others.  (AR 610).  But she stated that her anxiety was improving, that she worried less, and that the voices were down to a whisper and "not so demanding."  (AR 610).  She smoked spice for several months in 2012 and had used other illegal drugs in 1998 and 1999.  (AR 610-11).  She could read but not "big, long words," could do simple writing, and had limited math skills.  (AR 611).  Her typical day involved watching television and performing various self-care and household tasks when reminded by her mother to do so.  (AR 611).  Sometimes she gets confused about the domestic tasks that she is doing, and her mother does not like her touching the stove because of this.  (AR 611).  She has to write down a shopping list or she will forget what to buy.  (AR 611).  During the mental status exam, Rice displayed no evidence of a thought disorder, but she did describe having ongoing and constant auditory hallucinations, which she said she still acts on at times.  (AR 612).  Her attention and concentration were adequate during conversation but waxed and waned during tasks of short-term memory.  (AR 612).  She was able to follow instructions well.  (AR 612).  Her mood was normal to the situation, and her affect was appropriate to her mood.  (AR 612).

Dr. Martin summarized that Rice reportedly was quite reliant on her mother for general direction in how to care for herself during a typical day, and she apparently was unable to function independently in terms of daily chores.  (AR 613).  Dr. Martin found that Rice was most likely functioning in the borderline range of intelligence or below.  (AR 614).  Although Rice demonstrated adequate memory skills, her cognitive skills and her skills of general knowledge

and reasoning were quite weak. (AR 614). Dr. Martin concluded that as such, Rice "would only be able to perform jobs requiring simple, repetitive, and well learned tasks in a very well supervised situation." (AR 614). Dr. Martin further opined that Rice's limited reading, writing, and math skills would also need to be considered. (AR 614). Dr. Martin assigned a GAF score of 25 and diagnoses of a schizoaffective disorder; a learning disorder, not otherwise specified; and borderline intellectual functioning, provisional. (AR 614).

On March 28, 2013, Amy Johnson, Ph.D., a state agency psychologist, reviewed Rice's record. (AR 179-83). On the psychiatric review technique, Dr. Johnson identified listings 12.02, organic mental disorders, and 12.04, affective disorders, and concluded that as to the "paragraph B" criteria of the listings, Rice had mild restrictions in activities of daily living; moderate difficulties in maintaining social functioning and in maintaining concentration, persistence, or pace; and no repeated episodes of decompensation of extended duration. (AR 180). Dr. Johnson found that the evidence did not establish the presence of the "paragraph C" criteria of the listings. (AR 180). Dr. Johnson gave no weight to Dr. Martin's GAF score of 25, finding that it was too low given Rice's daily activities. (AR 180). In a mental RFC capacity assessment, Dr. Johnson found that Rice was moderately limited in understanding, remembering, and carrying out detailed instructions; sustaining an ordinary routine without special supervision; interacting with the general public; accepting instructions and responding appropriately to criticism from supervisors; getting along with coworkers or peers without distracting them or exhibiting behavioral extremes; and responding appropriately to changes in the work setting. (AR 182-83).

Dr. Johnson concluded that Rice's attention and concentration were moderately impacted but still appeared reasonable for tasks. (AR 183). She found that Rice was able to tolerate

superficial, casual interactions with others.  (AR 183).  Dr. Johnson stated:

> [Rice] has the mental capacity to understand, remember, and
> follow simple instructions.  [Rice] is restricted to work that
> involves brief, superficial interactions [with] fellow workers,
> supervisors and the public.  Within these parameters and in the
> context of performing simple, routine, repetitive, concrete, tangible
> tasks, [Rice] is able to sustain attention and concentration skills to
> carry out work like tasks with reasonable pace and persistence.

(AR 183).  Several months later, F. Kladder, Ph.D., another state agency psychologist, reviewed

Rice's record and reached the same conclusions as Dr. Johnson.  (AR 192-96).

In May 2013, Rice returned to Ms. Lothamer, and a mental status exam was unchanged

from her December 2012 visit except that Rice had a euthymic mood and good judgment.  (AR

657).  A mental status exam in November 2013 was also unchanged.  (DE 756-59).  Ms.

Lothamer wrote that Rice was "[m]aintaining well and stable."  (DE 759).

In February 2014, Rice saw Ms. Lothamer, and a mental status examination was

unchanged from her last visit except that her mood was depressed.  (AR 793).  Ms. Lothamer

indicated that Rice was "[s]ymptomatic but stable."  (AR 794).  In May 2014, a mental status

examination was unchanged except that Rice's mood was euthymic.  (AR 818).  Ms. Lothamer

wrote that Rice was "[m]aintaining well and stable."  (AR 819).  In August 2014, Rice stated that

she felt her medications were "good" at the current dosage even thought she continued to hear

whispering voices.  (AR 1086).  She had a Medicaid hearing upcoming and was afraid she was

going to lose her coverage.  (AR 1086).  A mental status exam was unchanged.  (AR 1088-89).

In November 2014, her mental status again was unchanged.  (AR 1071-73).  She had lost her

Medicaid and needed medications but had not followed up with the referral source that she was

given three weeks earlier.  (AR 1075).  She was advised again to do so.  (AR 1075).

In December 2014, Ms. Lothamer completed a mental impairment questionnaire on Rice's behalf. (AR 1095-1101). She indicated that Rice complains of depression, hearing voices, poor sleep, and low energy. (AR 1095-96). She wrote that the voices tell Rice to hurt others or herself and that Rice has thoughts of hurting others. (AR 1096). She also indicated that Rice's symptoms, including her thoughts of hurting others, would worsen if she returned to full-time work. (AR 1098). She wrote that Rice could not tolerate being around other people due to her thoughts of hurting others and would likely be absent from work more than three days a month. (AR 1098-99). Ms. Lothamer stated, however, that Rice could work alone or apart in physical isolation from others. (AR 1100). Ms. Lothamer opined that Rice had problems maintaining attention and concentration and could remain on task less than 70% of the workday, and that even if Rice complied with her medications and therapy, her symptoms would still continue. (AR 1099-1100).

## III. STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g); *see* 42 U.S.C. § 1383(c)(3). The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted). The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.* Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Id.* Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision. *Id.*

## IV. ANALYSIS

### A. *The Law*

Under the Act, a plaintiff is entitled to SSI if she "is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 1382c(a)(3)(D).

In determining whether Rice is disabled as defined by the Act, the ALJ conducted the familiar five-step analytical process, which required him to consider the following issues in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App'x 1; (4) whether the claimant is unable to perform her past work; and (5) whether the claimant is incapable of

performing work in the national economy.[5]  *See Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th

Cir. 2001); 20 C.F.R. § 416.920.  An affirmative answer leads either to the next step or, on steps

three and five, to a finding that the claimant is disabled.  *Zurawski v. Halter*, 245 F.3d 881, 886

(7th Cir. 2001).  A negative answer at any point other than step three stops the inquiry and leads

to a finding that the claimant is not disabled.  *Id.*  The burden of proof lies with the claimant at

every step except the fifth, where it shifts to the Commissioner.  *Id.* at 885-86.

## B. The Commissioner's Final Decision

On March 3, 2015, the ALJ issued the decision that became the Commissioner's final

decision.  (AR 24-43).  At step one of the five-step analysis, the ALJ found that Rice had not

engaged in substantial gainful activity since January 4, 2013, the application date.  (AR 21).  At

step two, the ALJ found that Rice had the following severe impairments:  asthma, COPD, and

emphysema; diabetes mellitus with some neuropathy; obesity; recurrent major depressive

disorder with a history of substance abuse and psychotic features; anxiety; borderline intellectual

functioning; a learning disorder; cannabis abuse; and degenerative disc disease.  (AR 27).

At step three, the ALJ concluded that Rice did not have an impairment or combination of

impairments severe enough to meet or equal a listing.  (AR 28-31).  Before proceeding to step

four, the ALJ determined that Rice's symptom testimony was credible in so far as it was

consistent with the following RFC (AR 31-32):

> [T]he claimant has the [RFC] to perform light work as defined in
> 20 CFR 416.967(b).  She can sit for six hours within an eight-hour
> workday; stand for six of eight-hours within a normal work day;

---

[5] Before performing steps four and five, the ALJ must determine the claimant's RFC or what tasks the
claimant can do despite her limitations.  20 C.F.R §§ 416.920(e), 416.945.  The RFC is then used during steps four
and five to help determine what, if any, employment the claimant is capable of.  20 C.F.R. §§ 416.920(e),
416.945(a)(5).

she can lift, carry, push, pull 10 pounds frequently and 20 pounds occasionally. There are no deficits in kneeling, crouching, crawling, balancing, or squatting, or deficits with reaching, fingering or fine/gross manipulation. She cannot climb ropes, ladders, or scaffolds; she can occasionally climb ramps and stairs. She can frequently bend and stoop in addition to what is required to sit. She is best to avoid work that involves driving and she is best to avoid work involving concentrated exposure to extreme amounts of fumes, dusts, gases, and extreme cold, heat, and humidity. The work should not involve an extensive amount of reading, such as work or product manuals, but she can engage in simple reading, spelling, and mathematics occasionally. She is limited to simple, routine, and repetitive tasks and she can maintain concentration required to perform simple tasks; she can remember simple work procedures; she is limited to work that can be learned within a short time frame-up to 30 days. She is best limited to work within a low stress job, defined as requiring only occasional decision making and only occasional changes in the work setting. She can tolerate predictable changes in the work environment; she can meet production requirements in an environment that allows her to sustain a flexible and goal-oriented pace; she is best limited from fast-paced work such as assembly line production work with rigid or strict productivity requirements. She is limited to superficial interaction with co-workers, supervisors, and the public, with superficial interaction defined as occasional and casual contact not involving prolonged conversation. Contact with supervisors still involves necessary instruction, but prolonged conversation is not necessary for task completion.

(AR 31-32).

At step four, the ALJ found that Rice had no past relevant work. (AR 41). The ALJ concluded at step five that based on the RFC and the VE's testimony, Rice could perform a significant number of unskilled, light exertional jobs in the economy, including small products assembler, electrical accessory assembler, electronics worker, bakery worker, and folder. (AR 42). Therefore, Rice's application for SSI was denied. (AR 43).

Rice argues that the ALJ erred by concluding at step three that she did not meet the "paragraph C" criteria of the 12.00 mental health listings. More particularly, Rice asserts that she met the "marginal adjustment" section of the "paragraph C" criteria. Rice's arguments ultimately have some merit, necessitating a remand of the ALJ's step-three finding for further analysis.

"The Listing describes impairments that are considered presumptively disabling when a claimant's impairments meet the specific criteria described in the Listing." *Maggard v. Apfel*, 167 F.3d 376, 379 (7th Cir. 1999) (citing 20 C.F.R. §§ 404.1525(a), 416.925(a)). "In considering whether a claimant's condition meets or equals a listed impairment, an ALJ must discuss the listing by name and offer more than a perfunctory analysis of the listing." *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004); *see also Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006); *Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 786 (7th Cir. 2003); *Scott v. Barnhart*, 297 F.3d 589, 595-96 (7th Cir. 2002). The claimant bears the burden of proving that her impairments meet or equal each element of a listed impairment. *Filus v. Astrue*, 694 F.3d 863, 868 (7th Cir. 2012); *Maggard*, 167 F.3d at 380.

The "paragraph C" criteria of the applicable mental health listings require:

> Medically documented history of [a chronic organic disorder; a chronic affective, schizophrenic, paranoid, or other psychotic disorder; or a chronic affective disorder] of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychological support, and one of the following:
>
> 1. Repeated episodes of decompensation, each of extended

16

duration; or

> 2.  A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in environment would be predicted to cause the individual to decompensate; or

> 3.  Current history of 1 or more years inability to function outside of a highly supportive living arrangement, with an indication of a continued need for such arrangement.

20 C.F.R. § 404 Subpt. P, App'x 1, §§ 12.02, 12.03, 12.04 (2015).

The parties do not dispute that Rice satisfies the first two criteria of "paragraph C," as at the time the ALJ issued his decision she had a mental health disorder of at least two years duration that had caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychological support. In that regard, the record evidences that Rice participated in mental health services at Park Center from January 2012 thorough December 2014 and that she received medication, counseling, and life skills training. The parties' dispute, rather, centers on whether Rice also met one of the other three remaining criteria of "paragraph C"—specifically, the marginal adjustment criterion.[6]

The Social Security regulations articulate that the marginal adjustment criterion is satisfied "when the evidence shows that, despite [the claimant's] diminished symptoms and signs, [a claimant] ha[s] achieved only marginal adjustment." 20 C.F.R. § 404 Subpt. P, App'x 1, § 1200D(g)(2)(c) (2018). This criterion is further defined in the regulations:

> "Marginal adjustment" means that your adaption to the requirements of daily life is fragile; that is, you have minimal capacity to adapt to changes in your environment or to demands that are not already part of your daily life. We will consider that

---

[6] Rice does not argue that the record contains evidence of repeated episodes of decompensation of extended duration or an inability to function outside of a highly supportive living arrangement. (DE 25 at 4).

> you have achieved only marginal adjustment when the evidence
> shows that changes or increased demands have led to exacerbation
> of your symptoms and signs and to deterioration in your
> functioning; for example, you have become unable to function
> outside of your home or a more restrictive setting, without
> substantial psychosocial supports (see 12.00D). Such deterioration
> may have necessitated a significant change in medication or other
> treatment. Similarly, because of the nature of your mental
> disorder, evidence may document episodes of deterioration that
> have required you to be hospitalized or absent from work, making
> it difficult for you to sustain work activity over time.

20 C.F.R. § 404 Subpt. P, App'x 1, § 12.00(G)(2)(c) (2018). Psychosocial supports as used in

12.00D means "[y]ou receive help from family members or other people who monitor your daily

activities and help you to function." 20 C.F.R. § 404 Subpt. P, App'x 1, § 12.00D (2018). "For

example, family members administer your medications, remind you to eat, shop for you and pay

your bills, or change their work hours so you are never home alone." 20 C.F.R. § 404 Subpt. P,

App'x 1, § 12.00D (2018).

    Here, when considering the "paragraph C" criteria, the ALJ stated:

> In this case, the evidence fails to establish the presence of the
> "paragraph C" criteria. The claimant has not experienced repeated
> episodes of decompensation, such marginal adjustment that even a
> minimal increase in mental demands would be predicted to cause
> [her] to decompensate, or a one or more year history of inability to
> function outside a highly supportive living arrangement.
> Specifically, the claimant is able to function independently inside
> and away from her home. She manages her personal hygiene, she
> makes her own decisions, and she drives a car.

(AR 31).

    This discussion of the "paragraph C" criteria by the ALJ, however, offers at best only a

perfunctory analysis of the marginal adjustment criterion. *Barnett*, 381 F.3d at 668. The last

two sentences of the ALJ's analysis pertain primarily to Rice's ability to function outside of a

highly supportive living arrangement; at most, they address the marginal adjustment

criterion—that is, the predicted impact on Rice of the increase in mental demands if she were to

return to full-time employment—in only a perfunctory manner.  This failure to discuss the marginal adjustment criterion in more than a perfunctory manner is problematic, given that Rice resides with her mother and grandmother and they help her with maintaining a daily schedule, complying with her medications, keeping her appointments, performing household tasks, and from getting overwhelmed.  (DE 19 at 10 (citing AR 326, 577, 578, 584, 590, 611, 717, 729, 770, 787, 806, 840)).  Rice also receives support from her church and through participating in psychological counseling and life-skills programs at Park Center.  (DE 19 at 10 (citing AR 578, 584, 590, 770, 787, 806, 1082)).

The Commissioner contends, however, that the ALJ's "paragraph C" finding is explained by the ALJ's discussion of the "paragraph B" criteria.  (DE 22 at 7).  When considering the "paragraph B" criteria, the ALJ found that Rice had moderate restrictions in activities of daily living, in maintaining social functioning; and in maintaining concentration, persistence, or pace.  (AR 30-31).  In making this finding, the ALJ observed that while Rice alleges disability as of November 2007, she had been living independently until just a few years before the December 2014 hearing, had functioned without her mother for many years, and "apparently, she did as she pleased" during those years.  (AR 24, 34, 40, 252-60, 365).  The ALJ also considered that Rice was very active in her church, attending twice a week and participating in door-to-door ministry.  (AR 30-32).  Rice also manages her own self care and drives a car.  (AR 30-32).  The ALJ concluded that while Rice's mental impairments did present extensive functional limitations, such limitations did not rise to the level contemplated the "paragraph C" criteria of the listings.

But the "paragraph B" criteria are not the same as the "paragraph C" criteria.  The treatment notes from Park Center are replete with concerns about Rice's reliance on her support system and concerns about her ability to handle the additional stress of returning to employment on a part-time basis, much less on a full-time basis.  (AR 326, 577-78, 584, 590, 611, 717, 729,

19

770, 787, 840, 1082). "The critical differences between activities of daily living and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter, can get help from other persons . . . , and is not held to a minimum standard of performance, as she would be by an employer." *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012); *see Punzio v. Astrue*, 630 F.3d 704, 712 (7th Cir. 2011) (reminding that a claimant's "ability to struggle through the activities of daily living" does not necessarily mean that she "can manage the requirements of a modern workplace"); *Johnson v. Astrue*, No. 11 CV 6668, 2012 WL 5989284, at *11 (N.D. Ill. Nov. 29, 2012) ("[A]n ALJ cannot rely solely on the claimant's or doctor's hopeful remarks made during better days, but must consider whether the claimant can hold a job even on low days." (citing *Bauer v. Astrue*, 532 F.3d 606, 609 (7th Cir. 2008)). The evidence of record pertinent to the marginal adjustment criterion of "paragraph C" merits more than a perfunctory discussion by the ALJ. *See, e.g, Tremaine by Tremaine v. Berryhill*, No. 1:16-cv-01268-TWP-DML, 2018 WL 1556172, at *8-9 (S.D. Ind. Mar. 30, 2018) (remanding the ALJ's decision for failing to confront evidence that conflicted with his step-three finding that the claimant did not meet the "paragraph C" criteria of listing 12.04); *Skorup v. Berryhill*, No. 3:16-CV-065-PPS-JEM, 2017 WL 2704885, at *3-6 (N.D. Ind. June 23, 2017) (remanding the ALJ's decision where the ALJ failed to analyze the marginal adjustment criterion of "paragraph C" of listing 12.02); *Eckermann v. Colvin*, No. 4:15-cv-04170-SLD-JEH, 2016 WL 8451417, at *8 (C.D. Ill. Dec. 13, 2016) (remanding the ALJ's decision for an inadequate analysis of the "paragraph C" criteria of listing 12.03); *Wiszowaty v. Astrue*, 861 F. Supp. 2d 924, 940-41 (N.D. Ind. 2012) (remanding the ALJ's decision due to the ALJ's perfunctory discussion of the "paragraph C" criteria of listing 12.02); *Herron v. Comm'r of Soc. Sec.*, No. 3:09-CV-519-PPS-

CAN, 2011 WL 2710027, at *3-4 (N.D. Ind. July 11, 2011) ("[I]n failing to provide a basis for his Paragraph C finding, the ALJ did not satisfy the minimum level at which he must articulate his analysis of the evidence." (citations omitted)).

The Commissioner argues, however, that the ALJ's step-three finding is bolstered by the opinions of Drs. Johnson and Kladder, the state agency psychologists, because they specifically concluded in their opinions that "[e]vidence does not establish the presence of the 'C' criteria." (AR 180, 192). It is true as a general matter that "[t]he ALJ may properly rely upon the opinion of these medical experts" when determining whether a claimant meets or equals a listing. *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004) (citing *Scott v. Sullivan*, 898 F.2d 519, 524 (7th Cir. 1990)); *see also* SSR 96-6p, 1996 WL 374180, at *3 (July 2, 1996). But in this instance, the ALJ's reliance on the opinions of Drs. Johnson and Kladder is problematic. These doctors issued their opinions in March and July 2013, respectively—*before* Rice had received at least two years of mental health treatment as required by "paragraph C." *See* 20 C.F.R. § 404 Subpt. P, App'x 1, § 12.00. However, at the time the ALJ issued his decision in March 2015, Rice *had* been participating in mental health treatment for more than two years, and thus by that time, Rice met this portion of the listing. As such, the ALJ's reliance on the opinions of Drs. Kladder and Johnson cannot rehabilitate the ALJ's perfunctory discussion of the marginal adjustment criterion of "paragraph C" in this instance.

As a result, a remand is necessary so that the ALJ may revisit his step-three finding and sufficiently analyze the "paragraph C" criteria of the mental health listings—in particular, the marginal adjustment criterion. *Barnett*, 381 F.3d at 668; *Skorup*, 2017 WL 2704885, at *6. Therefore, the ALJ's decision will be reversed, and the case will be remanded to the

Commissioner for further proceedings consistent with this Opinion and Order.[7]

## V. CONCLUSION

For the foregoing reasons, the decision of the Commissioner is REVERSED, and the case is REMANDED to the Commissioner in accordance with this Opinion and Order. The Clerk is directed to enter a judgment in favor of Rice and against the Commissioner.

SO ORDERED.

Entered this 8th day of May 2018.

/s/ Susan Collins
Susan Collins
United States Magistrate Judge

---

[7] Because a remand is warranted to revisit the ALJ's step-three finding, the Court need not reach Rice's remaining argument.